UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                    :

SHANNON THOMASON, *individually and as parent*
*and natural guardian of* E.P.,         :

                              :

                Plaintiff,      :            23-cv-8654 (LJL)

                              :

          -v-                   :        OPINION AND ORDER

                              :

NEW YORK CITY DEPARTMENT OF EDUCATION,  :
and DAVID C. BANKS *in his official capacity as*
*Chancellor of the New York City Department of*
*Education*,             :

                              :

              Defendants.    :

                              :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/27/2025

LEWIS J. LIMAN, United States District Judge:

      Shannon Thomason ("Plaintiff" or "Thomason") brings this action pursuant to the

Individuals with Disabilities Education Improvement Act, ("IDEA"), 20 U.S.C. § 1401 *et seq*.,

against the New York City Department of Education (the "DOE") and David C. Banks in his

official capacity as Chancellor of the DOE ("Banks," and, together with the DOE, "Defendants").

Dkt. No. 1.  Plaintiff moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Dkt. No. 18.  Defendants cross-move for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  Dkt. No. 24.

## BACKGROUND

      The relevant facts in this action are not in dispute.[1]

---

[1] The Court notes that it previously ruled upon an administrative challenge filed by Thomason
against the DOE and then-Chancellor of the DOE, Meisha Porter, in connection with E.P.'s school
placement for the 2019–2020 school year in *Thomason v. Porter*, 2023 WL 1966207 (S.D.N.Y.
Feb. 13, 2023).  Although the Court occasionally refers to its decision in that case for its rulings
of law, it does not rely on any of the facts discussed therein for purposes of the instant case's cross-
motions for summary judgment.

I.      **Statutory and Regulatory Background**

The IDEA guarantees that students with disabilities are provided a "free appropriate public education" ("FAPE").  20 U.S.C. § 1400(d)(1)(A).  The IDEA is designed to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs" and to "ensure that the rights of children with disabilities and parents of such children are protected."  *Id.* §1400(d).  "The IDEA offers federal funds to states that develop plans to assure all children with disabilities residing in each such state a free appropriate public education."  *See M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 223 (2d Cir. 2012) (citations and alterations omitted).  These services are administered according to an individualized education program ("IEP"), which the school district must implement each year for children with disabilities and is described as the centerpiece of the IDEA's educational system.  *Id.*  An IEP is a "written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'"  *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)), *opinion amended on denial of reh'g*, 480 F.3d 138 (2d Cir. 2007).  "The IEP is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child."  *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 368  (1985).

New York State "has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts."  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007).  "The CSE is composed of several individuals, including the parents, the student's

special education teacher, a school psychologist, a school district representative knowledgeable about the district's resources, a school physician, and a parent representative." *Thomason*, 2023 WL 1966207, at *6 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012)).

If a New York parent believes an IEP is insufficient under the IDEA or that the child is not being provided a FAPE, the parent "may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district by filing what is known as a due process complaint." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (citation omitted). Under the *Burlington/Carter* test, a parent is entitled to reimbursement if "(1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014) (citing *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013)); *see Florence Cnty. Sch. Dist. Four v. Carter ex. rel. Carter*, 510 U.S. 7, 12–16 (1993); *Burlington*, 471 U.S. at 373–74.

The parent's challenge to the IEP triggers an impartial due process hearing conducted before an Impartial Hearing Officer ("IHO") appointed by the local board of education. *See M.H.*, 685 F.3d at 224–25. The IHO's decision may be appealed by either party to a State Review Officer ("SRO"), an officer of the New York State Department of Education. *See id.* at 225. A "'party aggrieved' by the findings of the SRO 'shall have the right to bring a civil action' in either state or federal court." *Id.* (quoting 20 U.S.C. § 1415(i)(2)(A)).

## II.    Factual Background

### A.    E.P.'s Individualized Education Program

E.P. was a twelve-year-old student during the 2022–2023 school year and has a brain injury that has resulted in severe global impairments and delays.  R298–373.[2]  E.P. has been diagnosed with, *inter alia*, cerebral palsy, spastic quadriplegia, and hypoxic ischemic encephalopathy.  *Id*. Those impairments adversely affect E.P.'s cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual and motor abilities, psychosocial behavior, physical functions, information processing, and speech.  *Id.*  E.P.'s IEP categorizes E.P.'s disability as a Traumatic Brain Injury.  *Id.*  E.P. is non-ambulatory and relies on a wheelchair for mobility.  *Id.*  He is nonverbal and communicates through eye-gaze assistive technology and related services as well as through facial expressions, body movements, and vocalizing.  *Id.*  E.P. has attended the International Academy for the Brain ("iBRAIN") since the 2018–2019 school year.  *Id.*  Through his multiple assistive technology devices and software, E.P. is able to type out responses in sentences and to expressively communicate in full sentences, problem solve, and self-advocate.  Dkt. No. 1-2 at 3.  During the during the 2021–2022 school, E.P. was "functioning near or at grade-level" across multiple academic domains including reading, phonics, sight-word recognition, spelling, math, and writing.  *Id.*  The February 2022 IEP describes E.P. as "inquisitive, bright, and consistently engage[d] across subjects and across disciplines." R302.

On February 16, 2022, a Committee on Special Education ("CSE") convened to develop an IEP for E.P. for the 2022–2023 school year.  R59.  Plaintiff attended, as did E.P.'s teacher and

---

[2] Citations to R# refer to the administrative record filed on the docket at Dkt. No. 17.  No party submitted a Local Rule 56.1 statement or additional evidence outside of the administrative record. The Second Circuit has held that IDEA litigants need not submit Local Rule 56.1 statements.  *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417–18 (2d Cir. 2009).

therapists at iBrain.  R99.  The CSE recommended a program placing E.P. in a classroom with a ratio of eight students to one teacher and one paraprofessional (known as an "8:1+1 class") and providing one hour of occupational therapy five times a week, one hour of physical therapy five times a week, one hour of individual speech/language therapy four times a week, one hour of group speech/language therapy once a week, parent counseling and training once a month, and school nurse services.  R364–65.  The IEP included access to a paraprofessional for health, ambulation, feeding, self-care, and safety, and for assistive technology devices and special transportation accommodations including a lift bus, and a 1:1 transportation paraprofessional.  *Id.*  The CSE excluded certain recommendations from iBRAIN including music therapy.  R298–373.

On April 12, 2022, DOE informed Plaintiff that it proposed the Robert Kennedy School for E.P.'s 2022–2023 school year.  R99, 290.  The Robert Kennedy School is wheelchair-inaccessible and so, on May 16, 2022, Plaintiff sent the DOE an email stating that the school could not accommodate E.P.  R246.  Plaintiff did not hear any response from the DOE.  On June 15, 2022, she signed an enrollment contract with iBRAIN for E.P.'s 2022–2023 school year.  R99.  On June 17, 2022, Plaintiff provided the DOE with a ten-day notice pursuant to 20 U.S.C. § 1412(a)(10)(C)(iii) of her intent to reenroll E.P. at iBRAIN and to seek public funding for that placement.  R255–57.  The notice, which was sent from Plaintiff's attorney, stated "[o]ur Clients remain willing and ready to entertain an appropriate DOE program and an appropriate public or approved non-public school placement that can provide the required intensive academic and related services program [E.P.] requires."  R257.

The DOE responded on June 28, 2022, proposing that E.P.'s IEP instead be implemented at M751 at S054 ("M751"), a District 75 school in Manhattan.  R289.  On June 30, 2022, Plaintiff called M751 and left a voicemail but did not receive a response.  R87.  Plaintiff discovered a New

York Post article dated February 4, 2022, stating that M751 was plagued with violence and parents' concerns were ignored.  R87–88, 158–69.[3]  Plaintiff emailed the DOE representative identified in the DOE's letter to request more information and a tour of the school, but she did not receive any response.  R88.  Plaintiff accordingly decided to maintain E.P. at iBRAIN.  R43.

### B.    The Impartial Hearing Officer's Findings of Fact and Decision

On July 6, 2022, Plaintiff filed a due process complaint alleging that E.P. had been denied a FAPE for the 2022–2023 school year and requesting tuition reimbursement for his enrollment at iBRAIN.  R34, 83–93.  The due process complaint alleged that the DOE's delays in responding to Plaintiff's concerns "deprived Parents of the opportunity to investigate and consider the proposed school" and "constitute a denial of FAPE."  R88, 90.  It also objected to several omissions in the IEP and stated that M751 does not represent an appropriate public school location for a multitude of reasons including, *inter alia*, that the school lacked air conditioning in the hallway where pull-out[4] sessions would take place, that the school had insufficient school hours to provide the related services mandated in E.P.'s IEP, that the school and other students presented safety risks, that the school is only partially wheelchair accessible, and that the majority of the other students are ambulatory.  R90.

A hearing on the merits was held over four days, on September 20, 2022, October 14, 2022, December 5, 2022, and December 21, 2022.  R32, 43.  Both sides presented documents and

---

[3] It is not clear when Plaintiff discovered the article.

[4] Educators distinguish between "pull-out" and "push-in" services.  "In a 'pull-out' model, a specialist provides instructional support or related services, to one student or a small group, in a separate setting outside of the general education classroom. Conversely, in a 'push-in' model, a specialist provides those services in the classroom."  *Rivas v. Banks*, 2023 WL 8188069, at *8 (S.D.N.Y. Nov. 27, 2023) (quoting *J.D. v. Rye Neck Union Free Sch. Dist.*, 2023 WL 1797170, at *3 n.3 (S.D.N.Y. Feb. 7, 2023)), *reconsideration denied*, 2024 WL 292276 (S.D.N.Y. Jan. 25, 2024), *and aff'd sub nom. Rivas v. Ramos*, 2024 WL 5244849 (2d Cir. Dec. 30, 2024).  "Push-in services thus occur simultaneously with classroom instruction."  *Id.*

witnesses.  R33, 43, 45–46.  On March 2, 2023, the IHO issued a nine-page decision (the "FOFD"),
finding that "the District failed to offer FAPE for the Student" and ordered the DOE to reimburse
Thomason and/or directly pay iBRAIN for "the cost of full-time tuition and a 1:1 paraprofessional;
and transportation costs with a 1:1 nurse during transportation" for the 2022-2023 school year.
Dkt. No. 1-1 at 8, 12.

The FOFD found that the IEP itself was sufficient except for the recommendation to place
E.P. at M751.  *Id.* at 6–8.  In reaching the conclusion that M751 was an inappropriate placement
for E.P., the FOFD primarily highlighted the hearing testimony of Kaitlyn Stillwagon
("Stillwagon"), a special education teacher and the unit coordinator responsible for ensuring M751
was in compliance with students' IEPs.  In particular, the FOFD noted Stillwagon's testimony that
"in order to fulfill the Student['s] related services mandates, most or all of the Student's related
services would have to be push-in, or there would have to be a 'reconvene[5] with the IEP team
and the parents, given the amount of related services and the special classes.'"  Dkt. No. 1-1 at 6.
It further included the following testimony by Stillwagon on cross examination:

> MR. GINDI: So looking at the occupational therapy mandate, so it states, "separate
> location, provider's discretion, classroom and/or therapy space".  Could you
> explain to us what that means?
>
> MS. STILLWAGON: That the location is up to the provider's discretion. It says
> classroom or therapy space. So (audio interference) is that it can be given in the
> classroom or in a separate therapy space, given the (audio interference).
>
> MR. GINDI: Okay. So if there were any issues, given the class mandate and the
> related service mandate, if there were issues in providing all these services during
> the time provided in the school week, these services can be provided push-in in the
> classroom to allow for all mandates to be sustained; is that correct?
>
> MS. STILLWAGON: Yes.

---

[5] Stillwagon testified that "if there is need to hold a reconvene meeting to discuss matters of the
IEP to update it based on the student's progress, the IEP team calls for a reconvene of the IEP,
given the parents' consent."  R706.

*Id.* at 6–7. By contrast, Thomason's lawyer argued at the hearing that "the testimony of Stillwagon shows that it's mathematically impossible to provide the level of service that the DOE has mandated [E.P.] receive at this location, given that the school starts at 8:30, finishes between 2:15 and 2:50, 45 minutes for lunch, leaving only about 5 hours a day to fit in the 16 hours of mandated related services and 35 mandated periods of academic instruction." R721.

Based on the hearing testimony, the FOFD agreed with Thomason's argument that "it would be mathematically impossible" for M751 to provide E.P. with the mandated instruction and related services set forth in his IEP because "the public-school periods are only forty-five (45) minutes long, and the services to be provided are sixty (60) minutes each long four (4) to five (5) times per week, in addition to providing 35 periods in special education per week." *Id.*; *see also* *id.* (holding that the DOE "failed to demonstrate exactly how the public school would be able to provide such services, even as push in services, if there is not enough time in its periods or school day to provide such services."). The FOFD stated that the DOE and its witnesses offered only the unpersuasive "conclusory assertion that the public school would be able to provide the services as push-in services." *Id.* Because it held that the DOE failed to offer E.P. a FAPE on that ground, the FOFD stated that it would not address Thomason's additional arguments related to whether a FAPE was provided to E.P. Dkt. No. 1-1 at 8.

The FOFD held that Thomason adequately discharged the burden of "establish[ing], by a preponderance of the evidence, that the unilateral placement provides 'educational instruction specifically designed to meet the unique needs of the student.'" *Id.* (quoting *Gagliardo*, 489 F.3d at 112). It stated that "[t]he Parents presented sufficient affidavit testimony and submitted substantial documentary evidence in support of their position that the placement at [iBRAIN] was appropriate." *Id.* at 10. "Mainly, the Parent was able to show that [iBRAIN's] school's periods

and school day was sufficient to provide the Student with the Student's special education instructions as well as the Student[']s related services." *Id.* The FOFD noted that "[a]lthough a finding of progress is not required for a determination that a student's unilateral placement is adequate, . . . it is a relevant factor to be considered" and that "the undisputed evidence supports a finding that the Student has made progress at [iBRAIN]." *Id.* (quoting *Gagliardo*, 489 F.3d at 115).

The FOFD also found that equitable considerations did not preclude or limit tuition reimbursement. *Id.* at 11–12. It recounted DOE's original proposal to place E.P. at a school that is not wheelchair-accessible and the failure of the representatives at M751 to adequately respond to Thomason's concerns. *Id.* It also noted that Thomason sent the notice of intent to enroll E.P. at iBrain for the 2022–2023 school year only after she had done so, stating that "[t]he District should have had an opportunity to cure the issues within the [ten-day notice] prior to the Parent enrolling the Student at [iBRAIN]." *Id.* However, it found that because the proposed placement at M751 was also inappropriate, the DOE's attempt to cure its initial inappropriate recommendation, "does not warrant the denial or reduction of the requested relief." *Id.* at 11–12.

## C.    The State Review Officer's Decision

The DOE appealed the IHO's findings. Dkt. No. 1-2 at 8. On June 2, 2023, the assigned SRO issued a nineteen-page decision reversing the FOFD (the "SRO Decision"). *See generally id.* The SRO Decision noted that "the parents do not cross-appeal from the IHO's adverse finding that the February 2022 IEP was sufficient nor the IHO's finding that the parents' additional arguments related to whether a FAPE was provided to the student did not need to be addressed" and thus that those findings were final and binding. *Id.* at 12.

The SRO Decision rejected Thomason's argument that "the timing of the June 28, 2022, school location letter they received 'mere days before the start of the school year' deprived them

of a meaningful opportunity to investigate the appropriateness of the assigned public school location." *Id.* at 13. It acknowledged that "[t]here is district court authority indicating that a parent has a right to obtain information about an assigned public school site" but it found that the timing of Thomason's and the DOE's communications did not actually deny E.P.'s parents the opportunity to obtain information about the school. *Id.* at 13–14 (noting "the timing of the parent's rejection of the initial placement in a letter dated June 15, 2022, the district's attempt to resolve the parents' concerns by assigning the student to a new school on June 28, 2022, and the parents' filing of the due process complaint notice on July 6, 2022" indicate that no procedural violation occurred). The SRO Decision further stated that "[a]ny other finding would foil the purposes of the ten-business day notice requirement, which is to give the district an opportunity to determine if it can provide a suitable education to the student." *Id.* at 14 (quoting *Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir. 2004)).

The SRO Decision found that the IHO erred in determining that "it was impossible for the assigned school to implement the student's recommended program as it could not be 'squeeze[d]' into a regular school day." *Id.* at 13. It noted that the FOFD had relied on selective portions of Stillwagon's testimony. *Id.* at 15–16. In particular, the SRO highlighted Stillwagon's affirmative answers to the questions whether M751 had the ability to implement the related services and education program recommended in the February 2022 IEP and whether the school would be able to accommodate sixteen hours of related services per week as mandated in the IEP. *Id.* at 16. It also quoted Stillwagon's testimony that if M751 needed more support for the amount of related services, the district would "provide us with outside providers" but also that M751 had "the personnel in our school specifically who implement those services." *Id.* The SRO Decision further noted that Stillwagon testified that "she was aware of some cases where related services were

provided 'after school or after hours or outside of regular hours'; however, she did not recall the details of a specific case where that happened." *Id.* The SRO Decision noted that, according to Stillwagon, school began at 8:30 a.m., ended at 2:50 p.m., and end-of-day bus transition took place from 2:15 p.m. to 2:50 p.m., with reading instruction continuing during the end of the day bus transition. *Id.* at 17. When specifically asked how E.P. would have received 60-minute sessions of related services when M751's periods were 45-minutes long, the SRO Decision noted that Stillwagon testified:

> It would just be in a period and a half, whether it's pull-out, they would stay in the related service offices for that amount of time and be transitioned back into the period that it's currently at, or they would—the related service would push-in, and transitioning from one class period to another would be a part of the session.

*Id.* The SRO held that the school's potential reliance on such push-in services did not violate the IEP because "[a]ccording to the February 2022 IEP, the student's related services were recommended to be provided in the classroom and/or therapy space, at the providers' discretion." *Id.* at 16.

The SRO Decision also rejected Thomason's argument that the DOE would have modified the IEP to fit the school instead of complying with the IEP as it was written. *Id.* at 16–17. At the hearing, Stillwagon admitted that it "would take some coordinating" to implement all of E.P.'s related services within a given day and within the school week, but testified that "if it's on the IEP, we're mandated to implement it." *Id.* The SRO Decision noted Stillwagon's testimony that "the IEP was 'living document' and that if it was determined that the student needed pull-out services to receive a FAPE 'there would most likely have to be more specification included in the IEP' and that the CSE would reconvene 'to update [the IEP] based on the student's progress . . . given the parents' consent.'" *Id.* at 16. The SRO's review of Stillwagon's full testimony indicated that the school was not planning to modify the IEP to avoid compliance; "rather, the evidence points to

processes for providing push-in services or reconvening the CSE with the parents' consent to fulfill [E.P.'s] related service mandates if it were determined that push-in services were not meeting the student's needs."

Ultimately, the SRO concluded that the purported issues with M751 were merely speculative and that "contrary to the IHO's finding, the evidence in the hearing record establishes that the district offered the student a FAPE for the 2022–23 school year." *Id.* at 14–15, 19 (citing *Thomason*, 2023 WL 1966207, at *17). Given that determination, the SRO Decision stated that "the necessary inquiry is at an end and there is no need to reach the issue of whether iBrain was an appropriate unilateral placement for the student or whether equitable considerations supported the parents' request for relief." *Id.* (citing *Burlington*, 471 U.S. at 370).

## PROCEDURAL HISTORY

The action was initiated by complaint filed on October 2, 2023. Dkt. No. 1.

On May 1, 2024, Plaintiff filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 along with a copy of the Certified Administrative Record and a memorandum of law in support of her motion for summary judgment. Dkt. Nos. 17–19. Defendants filed a cross-motion for summary judgment on June 12, 2024, along with a memorandum of law in opposition to Plaintiff's motion for summary judgment and in support of Defendants' motion for summary judgment. Dkt. Nos. 24–25. On June 27, 2024, Plaintiff filed a memorandum of law in opposition to Defendants' motion for summary judgment and in further support of Plaintiff's motion for summary judgment. Dkt. No. 26. On July 8, 2024, Defendants filed a reply memorandum of law in support of their motion for summary judgment. Dkt. No. 29.

## LEGAL STANDARD

In an IDEA case, summary judgment "involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *R.E.*,

694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)).  The district court's role, however, is "circumscribed."  *A.C.*, 553 F.3d at 171.  "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Id.* (citation omitted).  This review "requires a more critical appraisal of the agency determination than clear-error review, but nevertheless falls well short of complete *de novo* review."  *M.H.*, 685 F.3d at 244 (citation and alterations omitted).  It "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982).

"Where, as in [this] case, the IHO and SRO disagree, the general rule is that 'courts must defer to the reasoned conclusions of the SRO as the final state administrative determination' . . . on matters requiring educational expertise unless [the court] concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  *R.E.*, 694 F.3d at 189 (quoting *A.C.*, 553 F.3d at 171); *see also S.K. v. City Sch. Dist. of City of N.Y.*, 2020 WL 1244473, at *11 (S.D.N.Y. Mar. 13, 2020) ("[W]here the SRO and IHO agree, deference to the conclusions of the administrators . . . is particularly appropriate." (quoting *C.W. v. City Sch. Dist. of N.Y.*, 171 F. Supp. 3d 126, 131 (S.D.N.Y. 2016))).  To determine whether the SRO's opinion is sufficiently well-reasoned to command some level of deference, "courts must look to the factors that 'normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court.'"

*R.E.*, 694 F.3d at 189 (quoting *M.H.*, 685 F.3d at 244); *accord M.P. v. Carmel Cent. Sch. Dist*, 2016 WL 379765, at \*4 (S.D.N.Y. Jan. 29, 2016).  Furthermore, more deference is due when the court's determination rests solely on the same evidence presented to the SRO.  *See E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 547 (S.D.N.Y. 2016).

"Different types of findings are also accorded different degrees of deference."  *S.K*, 2020 WL 1244473, at \*11 (citation omitted).  Because the reasons for deference are rooted in the SRO's knowledge and experience of education policy, *see R.E.*, 694 F.3d at 189, an SRO's findings regarding an IEP's substantive adequacy command more deference than an SRO's findings concerning purported procedural defects, *see E.H.*, 164 F. Supp. 3d at 547.  At the lowest end of the spectrum, "courts owe no deference to state hearing officers" on legal issues.  *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021).

## DISCUSSION

Under the *Burlington/Carter* test, parents are entitled to reimbursement of private-school tuition only if "(1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement."  *T.M.*, 752 F.3d at 152; *see also Carter*, 510 U.S. at 12–16; *Burlington*, 471 U.S. at 373–74.  "To determine whether the IEP complies with the IDEA and the district has provided the student with a FAPE—the first prong of the Burlington/Carter test—courts must 'make a two-part inquiry . . . first, procedural, and second, substantive.'"  *Thomason*, 2023 WL 1966207, at \*7 (quoting *A.M. v. N.Y.C. Dep't of Educ.*, 845 F.3d 523, 534 (2d Cir. 2017)); *see also R.E.*, 694 F.3d at 190; *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). "If a court determines that the challenged IEP was procedurally and substantively adequate, the court need not consider the last two prongs of the Burlington/Carter test."  *Thomason*, 2023 WL 1966207, at \*7; *see M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000)

("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end.").

Plaintiff argues that the IEP was both procedurally and substantively deficient. Dkt. No. 19 at 12–17; Dkt. No. 26 at 2–12.

## I.    Procedural Challenge

Plaintiff argues that the IEP was procedurally deficient because the DOE's failure to respond promptly to Plaintiff's concerns denied Plaintiff the ability to meaningfully participate in the school-selection process. Dkt. No. 19 at 12–14; Dkt. No. 24 at 2–7. She points to the fact that the DOE did not inform her of the ultimately proposed public school until June 28, 2022, which was "mere days before the start of the school year." Dkt. No. 19 at 7. Defendants counter that the DOE sent the updated placement at that late date only in response to Plaintiff's June 17, 2022, ten-day letter stating her intention to enroll E.P. at iBRAIN. Dkt. No. 25 at 9.[6] Defendants also cite the SRO's observation that in light of Thomason's detailed due process complaint, which was filed on July 6, 2022, "it does not appear that the assignment of the student to a school just prior to the start of the 2022–23 school year denied the parents the opportunity to obtain information about the school." Dkt. No. 1-2 at 13–14. The SRO's determination on this issue (albeit well-reasoned) is owed lesser deference as the issue turns on questions of procedure rather than education policy. *See E.H.*, 164 F. Supp. 3d at 547. Nonetheless, the Court comes to the same conclusion as the SRO Decision.

"[C]ourts have found that parents have the right to obtain timely and relevant information regarding school placement, in order to evaluate whether the IEP can be implemented at the proposed location." *H.L. v. N.Y.C. Dep't of Educ.*, 2019 WL 181307, at *9 (S.D.N.Y. Jan. 11,

---

[6] Although Defendants state that Plaintiff's letter was dated June 15, 2022, the correct date is June 17, 2022. *Compare* Dkt. No. 25 at 9 *with* R255–57.

2019). Parents have a right to participate in decisions affecting the education of their child. *See Honig*, 484 U.S. at 311–12; *Rowley*, 458 U.S. at 205, 208–09. "[P]arents have a procedural right to evaluate the school assignment, *i.e.*, the right to acquire relevant and timely information as to the proposed school." *FB v. N.Y.C. Dep't of Educ.*, 132 F. Supp. 3d 522, 540 (S.D.N.Y. 2015) (quoting *V.S. v. N.Y.C. Dep't of Educ.*, 25 F. Supp. 3d 295, 299 (E.D.N.Y. 2014)). Where a delayed school location letter impedes a parent's opportunity to participate in the decision-making process for the student's placement, including by visiting or evaluating the locations under consideration, such delay may amount to a procedural violation. *See, e.g., H.L.*, 2019 WL 181307, at *9; *C.U. v. N.Y.C Dep't of Educ.*, 23 F. Supp. 3d 210, 227–29 (S.D.N.Y. 2014) ("Parents ha[ve] at least a procedural right to inquire whether the proposed school location ha[s] the resources set forth in the IEP.").

At the same time, however, the IDEA contemplates that parents will cooperate with the school district "in determining the appropriate placement and educational plan for their child," *Greenland Sch. Dist.*, 358 F.3d at 159, and provides a framework for doing so. The IDEA requires parents to "give written notice of their intention to place their child in a private school and seek reimbursement" ten business days (including holidays) "prior to the removal of the child from the public school" or else reimbursement may be reduced or denied. 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb); *see Arlington Cent. Sch. Dist. v. D.K. & K.K.*, 2002 WL 31521158, at *11 (S.D.N.Y. Nov. 14, 2002).[7] In the written notice, the parents must state that they

---

[7] In lieu of a written ten-day notice, parents may alternatively "inform the IEP teams at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, . . . that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa). There is no indication in the record that Plaintiff gave such notice of rejection at any IEP meeting.

are "rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii)(I). "[T]he notice requirement serves the important function of facilitating cooperation between parents and school districts by requiring parents to give the school system an opportunity to provide the student with a FAPE in public school before resorting to a private school placement." *S.W. v. N.Y.C. Dep't of Educ.*, 646 F. Supp. 2d 346, 361 (S.D.N.Y. 2009); *see also Greenland Sch. Dist.*, 358 F.3d at 160. That statutory language underscores the understanding that "parents ha[ve] to 'put FAPE at issue' by giving the school district an opportunity to evaluate a child and try to devise an appropriate public school program for her prior to placing the child in a private school." *Carmel Cent.*, 373 F.Supp.2d at 414.

Here, although Plaintiff's ten-day notice stated that she was "willing and ready to entertain an appropriate DOE program and an appropriate public or approved non-public school placement that can provide the required intensive academic and related services program [E.P.] requires," R257, the timing of the notice undermined the possibility of subsequent collaboration toward an appropriate public school placement. The DOE informed Plaintiff of the initial proposed school on April 12, 2022, and Plaintiff knew that the school was an unfit placement by at least May 16, 2022. R99, 246, 290. Although Plaintiff sent the DOE an email on May 16, 2022, explaining that the proposed school was an inappropriate placement, she did not at that time give written notice to the DOE stating that she was rejecting the proposed placement or that she intended to enroll E.P. at a private school at public expense. R246. Instead, a month later she enrolled E.P. at iBRAIN, still without giving the DOE a prior ten-day notice. R99. Only after Plaintiff signed the enrollment contract with iBRAIN did she send the notice—by which point it was too late for the DOE to cure

the issue and allow Plaintiff time to investigate the new proposed placement before the end of the

school year. R99, 255–57. There is no reason to believe that the DOE would have informed

Plaintiff of the alternative proposed school placement so late in the school year had Plaintiff acted

with more alacrity in informing the DOE that she was withdrawing E.P. from the public school

system. Once Plaintiff sent the notice, the DOE responded with a purportedly appropriate public

school placement seven business days later—well within the ten business days contemplated by

the statute. R289. Nonetheless, Plaintiff claims that by that time, it was too late. The SRO

Decision is correct that finding a procedural violation in these circumstances "would foil the

purposes of the ten-business day notice requirement." Dkt. No. 1-2 at 14.[8]

## II.    Substantive Challenge

Plaintiff argues that the IEP was substantively deficient because "the [DOE's]

recommendation to place the Student at the M751 public school was not designed to meet his

unique needs and lacked the related services necessary to permit the Student to benefit from the

instruction. Dkt. No. 19 at 15. In particular, Plaintiff claims that "it is mathematically impossible"

that M751's school day could fit E.P.'s related services. *Id.* at 16.[9]

---

[8] Plaintiff cites *C.U. v. New York City Department of Education*, but that case is distinguishable.
In *C.U.*, the DOE's dilatory responses to the student's parents' prompt and frequent attempts to
communicate effectively stymied any possible cooperation. *See C.U.*, 23 F. Supp. 3d at 218–19,
233. There, plaintiffs case sent the ten-day notice one week after it became clear that the DOE
had failed to meet the promised deadline and there is no indication that the DOE even attempted
to (or could) cure the IEP's substantive deficiencies within that time. *Id.* at 218–19. Here,
however, Plaintiff waited over a month after she was aware of the initial proposed school's
deficiencies—and two days after she enrolled E.P. in iBRAIN—to send the ten-day notice. R99,
255–57. By the time the DOE responded with a (sufficient) attempt to cure the substantive
deficiencies within those ten days, the time for possible cooperation had passed.

[9] In her reply brief, Plaintiff raises the additional issue that the IEP itself is vague as it does not
specify whether outside vendors or contractors would provide E.P.'s related services as opposed
to exclusively school personnel and because it does not clarify whether the "therapy space" where
related services are to be provided is a separate location within the school. Dkt. No. 26 at 10–11.
Plaintiff argues that the SRO accordingly drew the impermissible assumptions "(1) that the
'therapy space' referenced in E.P.'s IEP was a space in the school itself, and (2) that the outside

Plaintiff's argument is unpersuasive for the reasons stated in the SRO Decision. Dkt. No. 1-2 at 14–17. Plaintiff repeats the argument that because "the public-school periods are only 45 minutes long, and the services to be provided are 60 minutes each long four to five times per week, along with providing 35 periods in special education per week[,] . . . the [DOE] failed to show precisely how the public school could provide such services, even as push-in services, if there is not enough time in its periods or school day to provide [E.P.] with such services." *Id.* (citing R38). But as Stillwagon testified, and the SRO Decision highlighted, M751 is not bound to provide services only within the framework of its regularly-scheduled periods. M751. It could provide E.P. either pull-out or push-in services that extend beyond a single period to take up part of the subsequent school period. Stillwagon testified that M751 had the ability to implement the related services and education program recommended in the February 2022 IEP and would be able to accommodate sixteen hours of related services per week as mandated in the IEP. R694–95. Plaintiff does not point to any record evidence that contradicts her testimony. M751's school day is six hours and twenty minutes long, making the standard school week approximately thirty-one hours long. Dkt. No. 1-2 at 17. Although that standard week is shorter than would be

---

vendor/contractor would not need to travel to the school to provide E.P.'s services." *Id.* at 11. Because it was raised for the first time on reply, this argument is waived. *See Fisher v. Kanas,* 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (collecting cases), *aff'd,* 288 F. App'x 721 (2d Cir. 2008). Even if the argument was not waived, it would not succeed as it is based on a misreading of the SRO Decision. The SRO Decision stated that *even assuming* the therapy space did refer to a separate location within the school and that outside vendors or contractors would not need to travel to the school, the use of outside providers to fill the mandated level of related services in such circumstances "would not constitute such a material or substantial deviation from the student's IEP that he was denied a FAPE thereby." Dkt. No. 1-2 at 18 n.15 (citing *A.P. v. Woodstock Bd. of Educ.,* 370 Fed. App'x 202,205 (2d Cir. Mar. 23, 2010) (summary order); *Van Duyn v. Baker Sch. Dist. SJ,* 502 F.3d 811, 822 (9th Cir. 2007); *Houston Indep. Sch. Dist. v. Bobby R.,* 200 F.3d 341, 349 (5th Cir. 2000)). That language thus expressed that even under a reading of the IEP and provision of services more favorable to Plaintiff's argument, E.P. still would not have been denied a FAPE. It does not provide a basis to reverse the SRO Decision.

necessary to fit sixteen hours of related services and thirty-five periods (totaling approximately twenty-six hours) of special education, in light of Stillwagon's testimony that M751 could provide related services outside of the school's regular hours, Plaintiff fails to show that it is "mathematically impossible" that M751 could provide all of the special education and related services mandated by the IEP.  R696.

Absent any evidence that M751 could not comply with the IEP, Plaintiff's arguments that E.P. was denied a FAPE are purely speculative.  *See G.S. v. N.Y.C. Dep't of Educ.*, 2016 WL 5107039, at *14 (S.D.N.Y. Sept. 19, 2016) ("[T]he Second Circuit has distinguished between cognizable challenges to the school's ability, capacity, or capability to implement the IEP, in contrast to mere speculation that the school district would not have adequately adhered to the IEP despite its ability to do so." (citation and alterations omitted)); *N.M. v. N.Y.C Dep't of Educ.*, 2016 WL 796857, at *8 (S.D.N.Y. Feb. 24, 2016) ("[A] claim based on what a school 'would not have' done—as opposed to a claim based on what the school could not do—is speculative and barred under *R.E.* and *M.O.*").  Plaintiff identifies no evidence that M751 was "incapable or unwilling to appropriately implement" the student's IEP, *B.K. v. N.Y.C Dep't of Educ.*, 12 F. Supp. 3d 343, 372 (E.D.N.Y. 2014), whereas the DOE introduced testimony affirming that compliance was possible and explaining how it could be accomplished, R694–96; Dkt. No. 1-2 at 15–19.  *See Thomason*, 2023 WL 1966207, at *17 (rejecting as speculative the argument that "the school would not implement the IEP's recommendation of sixty-minute speech therapy sessions, even though it had the ability to accommodate the sessions").

Plaintiff alternatively argues that "[c]hanging the IEP to fit the school is an admission that the school does not have the resources to implement the IEP" and thus that Stillwagon's statement that there might have to be a "reconvene with the IEP team and the parents, given the number of

20

related services and the special classes," is evidence that E.P. was denied a FAPE.  Dkt. No. 19 at

15–16 (citing R106).  However, as the SRO Decision made clear, Stillwagon *did not* say that the

IEP would need to be altered before M751 could come into compliance with it.  Dkt. No. 1-2 at

17.  Instead, she stated that, if needed, a reconvene meeting could be held with the parents' consent

to discuss the IEP and to "update it based on the student's progress," so that if services should only

be provided in a certain manner (such as pull-out as opposed to push-in or vice versa), those

specifications can be added to the IEP.  R706.  Stillwagon's testimony on that matter thus does not

indicate that M751 could not provide the services that were then in the IEP such that E.P. was

denied a FAPE.

Because Plaintiff does not show that the school district's proposed placement violated the

IDEA, the Court need not consider the two remaining prongs of the *Burlington/Carter* test.  *See*

*M.C.*, 226 F.3d at 66; *Thomason*, 2023 WL 1966207, at *7.

## CONCLUSION

Plaintiff's motion for summary judgment is DENIED.

Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed enter judgment for Defendants and to close

this case.

SO ORDERED.

Dated: January 27, 2025
        New York, New York                         _____
                                                    LEWIS J. LIMAN
                                                    United States District Judge